In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

## NO. 09-21-00034-CV
_____

## LEAFGUARD OF TEXAS, INC., Appellant

## V.

## STEPHEN RAY GUIDRY, Appellee

**On Appeal from the 60th District Court**
**Jefferson County, Texas**
**Trial Cause No. B-203,669**

## MEMORANDUM OPINION

Leafguard appeals from a take-nothing judgment as to its claim against Guidry and a monetary judgment in favor of Guidry on Guidry's counterclaim. Appellant raises six issues in this appeal: 1) the court improperly allowed Guidry's witness to testify as an expert when Guidry failed to properly designate the witness as an expert; 2) the evidence is insufficient to prove Leafguard breached the contract; 3) the evidence is insufficient to prove any damages were caused by Leafguard; 4) the

1

evidence is insufficient to support the award of past and future damages to Guidry; 5) there is insufficient evidence to support the attorney fee award; and 6) because Guidry failed to pay the amount due under the contract, Leafguard is entitled to judgment for the contract amount. We reverse and remand.

## I. Background

In 2017, Hurricane Harvey damaged Guidry's home, including portions of the roof and some interior drywall. Guidry retained Leafguard[1] to make repairs to his home including updating and replacing his siding and windows at a total contract price of $34,613.[2] After installation, Guidry notified Leafguard of some problems with the work and Leafguard made further repairs, replaced the siding, and it replaced several of the windows at its own expense. Guidry argued that despite Leafguard's remedial measures, problems remained. For that reason, Guidry did not pay Leafguard anything for the work and eventually Leafguard filed a lawsuit against Guidry for the contract price, plus interest and attorney's fees. In the Original and Amended Petitions, Leafguard alleged claims for breach of contract, quantum meruit, unjust enrichment, prompt payment, and sought attorney's fees, costs, and interest. Guidry filed a general denial and then counterclaimed, alleging that

_____

[1] Leafguard's complete name is Leafguard of Texas, Inc., d/b/a Beldon Houston.
[2] There were separate contracts for the siding and the windows, as well as a change order.

2

Leafguard's work was not only substandard, but that it caused damage to his home, requiring him to incur substantial repair costs.

After a bench trial, the trial court found in favor of Guidry as to his claims for breach of contract and awarded Guidry damages in the amount of $26,236 in past damages and $27,703.20 in future damages, together with attorney's fees in the amount of $10,000. The trial court denied any relief to Leafguard on its claims. The trial court entered findings of fact and conclusions of law in support of its judgment. Leafguard timely filed a notice of appeal.

## Summary of Evidence Presented at Trial

### A. Christopher Jackson's Testimony

Leafguard's general manager, Christopher Jackson, testified about his responsibilities in the case, noting that he became involved in the matter only after Guidry failed to pay for the work that Leafguard had performed. He authenticated the contracts between Leafguard and Guidry and stated that they reflected normal rates and materials for the windows and siding that were the subject of the contracts. Jackson sent technicians to the project location to verify correct sizes and measurements and indicated that Guidry reported no problems with the work until Leafguard requested payment of the contract price, in approximately June or July of 2018.

According to Jackson, after payment became an issue, Guidry complained that the siding was the wrong color and incorrectly installed, and that the windows leaked. Jackson acknowledged that the siding, as initially installed, was not the color that Guidry had ordered, the windows were not properly caulked, and that the first siding subcontractor Leafguard hired had painted the siding, voiding the warranty. Leafguard consequently removed the siding that was the wrong color and installed all new siding in the correct color. When removing that siding, Leafguard's new siding contractor discovered that Guidry's house needed additional bracing and fasteners so that the finished project would meet Texas Department of Insurance standards for windstorm compliance. This discovery increased the scope of the work and Leafguard issued a change order, which Guidry signed, for an additional $2500. That change order and the agreements for the work were entered into evidence without objection. According to the original agreement, the scope of the work included removal of the existing vinyl siding and application of "Hardie" "autumn tan" siding for $14,900; the installation of 14 "AMI 2000 series beige" windows for $17,203; and a subsequent change order to replace fascia and soffits for $2500. The work orders reflect the dimensions and location of each window, as well as the lengths of the fascia, soffits, and frieze boards to be installed.

Jackson denied that Leafguard or its contractors disturbed Guidry's roof while installing, removing, or reinstalling the siding or the windows.

According to Jackson, Guidry's complaints about window leaks prompted Leafguard to attempt to identify the problem, but it was unable to do so. Notwithstanding Leafguard's inability to identify the alleged window leaks, it replaced six of the fourteen windows it had installed, at no additional cost to Guidry. Although the windows passed inspection for hurricane compliance purposes, the reinstalled siding was not inspected because Guidry did not permit the inspector to perform the inspection. Jackson explained the procedures by which the fascia and soffits were installed by Leafguard's contractors, and how they accomplished the installation without lifting the shingles; he insisted they did not disturb the roof.

**B. Stephen Guidry's Testimony**

Guidry, the defendant and counter-plaintiff, testified that although he did sign the contracts with Leafguard, the Leafguard salesman misrepresented various unspecified contractual terms. Guidry further testified that Leafguard's workmanship was unacceptable, in that Leafguard damaged his roof, causing it to leak, and he testified that "some of the windows" that Leafguard installed also leaked. He further stated that the material Leafguard used was thicker than the vinyl siding that previously was installed on his house. Guidry stated that the use of this thicker material resulted in the roof failing to overhang the fascia, which caused water to leak into his house. He denied that his prior vinyl fascia boards were composed of a thin sheet of vinyl wrapped around a board, rendering the vinyl fascia

5

material approximately the same thickness as the new siding material that Leafguard installed. He further stated that leaks developed only after Leafguard performed its work. Guidry acknowledged that after Hurricane Harvey, C & H Roofing repaired sections of his then three-year-old roof. He stated, however, that because only a small portion of the roof needed repair after the hurricane, he neither needed nor received a new windstorm certificate for his roof when C & H completed its repair work. He also testified that C & H installed a new roof after Hurricane Harvey, and that it was windstorm certified at that time. Guidry testified later that he did not receive a new windstorm certification after Hurricane Harvey for the limited amount of repair work C & H performed.

Guidry explained that he took photographs of the work but he was unable to state whether the pictures were taken before, during, or after Leafguard performed work on the property. He also confirmed that he had not paid Leafguard any money for the work and averred that all the windows needed replacement—even though only two of them leaked. Guidry's testimony contradicted his earlier testimony that six of his windows leaked after Leafguard replaced them. Although Guidry insisted that Leafguard had raised the shingles on the roof, thereby damaging his roof, he could produce no evidence that it occurred.

## C. Kenneth McCurtain's Testimony

McCurtain, a carpenter, testified that although he had performed previous work for Guidry, he became familiar with the issues relevant to this case when Guidry called him to evaluate some cosmetic issues in Guidry's kitchen. At that time, Guidry apprised the witness of his complaints of roof and window leaks. McCurtain inspected the eaves and windows and concluded the windows were improperly installed. McCurtain testified that due to shoddy workmanship, the overhang eaves were rotting, and the fascia boards were incorrectly installed and were "too far out[]" for the roof decking to cover them. In his opinion, this shortcoming permitted water to leak into Guidry's house. He testified the proper remedy would require the replacement of the entire roof.

McCurtain testified that he did not remedy the leaks around the windows, but instead performed interior drywall work, which he identified in Guidry's photos. He indicated that the only way to address the air and water leaks would be to install new windows because the current windows might bend or break during the reinstallation process. He also stated that all Guidry's windows leaked.

When asked about the price of the repair work, McCurtain testified that the repair estimates he provided in July of 2019, over a year before the trial date, were reasonable at the time and place given, but the estimates should be adjusted upward twenty percent to account for increased material and labor costs. In addition, he

testified that Guidry paid him $5462 and $5874, for repair projects that he completed on Guidry's residence.

## II. Standard of Review

Leafguard's arguments fall into two categories: abuse of discretion as to evidentiary rulings, and sufficiency of the evidence to support the trial court's judgment.

As for the legal sufficiency challenges to the judgment, evidence is legally insufficient to support a finding when: (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 613 (Tex. 2016) (citation omitted). Evidence is also considered legally insufficient if it is conclusory, meaning that it "asserts a conclusion with no basis or explanation." *Windrum v. Kareh*, 581 S.W.3d 761, 768-70 (Tex. 2019).

In a bench trial, as the sole judge of the credibility of the witnesses and the weight to give their testimony, the trial court may choose to believe one witness and disbelieve another. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). The trial court also "may disregard even uncontradicted and unimpeached testimony

from disinterested witnesses." *Id.* at 820. But it is "not free to believe testimony that is conclusively negated by undisputed facts." *Id.* In our appellate review, we "credit favorable evidence if [a] reasonable [trier of fact] could, and disregard contrary evidence unless [a reasonable trier of fact] could not." *Id.* at 827. "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.*

In challenging the factual sufficiency of the evidence supporting an adverse finding on which Leafguard did not have the burden of proof at trial, Leafguard must demonstrate that there is insufficient evidence to support the adverse findings. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983); *Am. Interstate Ins. Co. v. Hinson*, 172 S.W.3d 108, 120 (Tex. App.—Beaumont 2005, pet. denied). When reviewing a factual sufficiency challenge, we consider and weigh all the evidence in support of and contrary to the trial court's finding. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406-07 (Tex. 1998). We set aside a finding only if it "is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Dyson v. Olin Corp.*, 692 S.W.2d 456, 457 (Tex. 1985) (citation omitted).

### III. Analysis

We will first consider the sufficiency of the evidence points raised by Leafguard in its second, third, fourth, fifth and sixth issues. Guidry's theory of the

9

case is that Leafguard materially breached its contract with him, thereby excusing his admitted failure to pay the contract price and exposing Leafguard to liability for its alleged damage to his home.

**A. The Contract**

In its findings of fact and conclusions of law, the trial court found that Leafguard materially breached its contract with Guidry, thus excusing Guidry's further performance under the parties' contract, including Guidry's payment for the materials and installation services that Leafguard provided. Assuming, for purposes of this analysis, that the trial court correctly determined that Leafguard materially breached the contract before Guidry's payment became due, the inquiry does not end there; Leafguard's material breach, if any, would not necessarily excuse Guidry's failure to pay the contract amount if Guidry treated the contract as continuing. *See Long Trusts v. Griffin,* 222 S.W.3d 412, 415 (Tex. 2006) (per curiam).

Guidry contends that a material breach by one contracting party will excuse further performance by the other party. We agree that a material breach may entitle the non-breaching party to terminate the contract and sue the breaching party for the breach if he chooses to do so. *See id.* (citation omitted). When, however, the nonbreaching party decides to treat the contract as continuing, even after the other party materially breached the agreement, the nonbreaching party may not then seek to excuse his own nonperformance. *See Dowtech Specialty Contractors, Inc. v. City*

10

*of Weinert*, 630 S.W.3d 206, 216 (Tex. App.—Eastland 2020, pet. denied). Here, the record reflects that Guidry chose to continue the contract and therefore he was not excused from paying Leafguard under the contracts. Specifically, we note that Guidry did not elect to terminate the contract, bring in a new contractor to do the job, or file suit as soon as he learned that Leafguard had installed the wrong siding on his house. Instead, he claimed the benefit of his contractual bargain and requested Leafguard to provide and install the siding specified in the contract. Guidry likewise requested and received replacement windows for the windows that were alleged to have been improperly installed, and he gave Leafguard the opportunity to cure its defects. Guidry did not sue Leafguard until December 5, 2019, nearly eight months after Leafguard sued Guidry for payment. Given this evidentiary and procedural posture of the case, we hold Guidry treated the window and siding contracts as ongoing, and therefore may not refuse payment based on Leafguard's previous material breach.

Guidry counterclaimed for breach of contract. "There are two measures of damages for the breach of a construction contract:  (1) remedial damages, which is the cost to complete or repair less the unpaid balance on the contract price, and (2) difference-in-value damages, which is the difference between the value of the building as constructed and its value had it been constructed according to the contract." (citations omitted). *See McGinty v. Hennen*, 372 S.W. 3d 625, 627 (Tex.

11

2012) (per curiam). The trial court found in favor of Guidry and made the following findings regarding damages: "[past damages] in the amount of $26,236.00…[and] future [damages] in the amount of $27,703.20 payable to Guidry. It appears that Guidry attempted to establish, to some extent, a claim for remedial damages through McCurtain's testimony about various costs to repair the alleged damage. The damages award is not supported by the evidence.

Guidry's evidence alleging faulty installation of either the siding or windows caused damage to the interior of his home are not supported by evidence that such costs were reasonable and necessary. It is not sufficient that the costs were of a nature and character that they were necessary and an amount was actually paid for them. Evidence showing the amounts paid were "reasonable" is also required. *Id.*, citing *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 200 (Tex. 2004) (per curiam).

## B. Legal and Factual Sufficiency

Leafguard contends the evidence is legally and factually insufficient to support the trial court's judgment awarding damages to Guidry. We will "sustain a legal-sufficiency challenge to an adverse finding if our review of the evidence demonstrates a complete absence of a vital fact, or if the evidence offered is no more than a scintilla." *Burbage v. Burbage,* 447 S.W.3d 249, 259 (Tex. 2014). A factual sufficiency challenge, on the other hand, requires us to evaluate the evidence as a

whole, and determine whether it supports the judgment. *Maritime Overseas Corp.,* 971 S.W.2d at 406-07. When both legal and factual sufficiency are in dispute, we first address the matter of legal sufficiency. *See Windrum*, 581 S.W.3d at 781.

### 1. The Windows

McCurtain and Guidry testified that some of the windows leaked, and McCurtain opined the windows were improperly installed because they were not installed with the top of each window above the frieze board, and that this error permitted rainwater to enter Guidry's house. This testimony is legally sufficient evidence that the windows were not correctly installed. We therefore must proceed to review the factual sufficiency of the evidence question.

The record contains evidence that there was leakage around some of the windows. Despite the contrary evidence that the windows did not leak when Leafguard tested them on multiple occasions, the trial court, as trier of fact, could have believed that there was leakage around some of the windows. Because windows would not be expected to leak, absent a construction defect, the trial court could have made an implicit finding that Leafguard improperly installed the windows, that improper installation proximately caused the leaks, and that Leafguard therefore was liable to Guidry for any resulting damages.

The damage evidence regarding the windows consists of McCurtain's testimony that his company performed interior drywall finish work at a cost of

13

$5,874. McCurtain testified that all new windows would need to be installed because the existing windows, if removed and reinstalled, "can break, they can bend, they could - - anything could happen to them to where they're not as sturdy as they were before." Guidry's evidence was factually insufficient to show the price paid for the work performed was reasonable and necessary. *See McGinty,* 372 S.W.3d at 627 (describing the measure of damages). Absent evidence that the amount paid was reasonable, no damages can be awarded based on the evidence in the record. *Id.* In addition, we note that in its Findings of Fact and Conclusions of Law, the trial court found that Guidry had sustained incidental damages, notwithstanding the fact that the parties' contracts conspicuously disclaimed liability for incidental or consequential damages. For this additional reason, the trial court erred in awarding the enumerated elements of incidental/consequential damage. Therefore, any award of consequential damages is disallowed. We sustain Leafguard's fourth point. We will remand the case to the trial court for a new trial to determine whether and to what extent any windows must be replaced and the reasonable and necessary cost therefor.

### 2. Soffit and Fascia

Guidry's complaint was that the Leafguard product, workmanship, or both, somehow caused the fascia boards to extend farther toward the outermost edge of the roof shingles than they previously had, and that this change caused water to leak

14

into Guidry's home. Specifically, Guidry contended that the new fascia boards that Leafguard installed were thicker than the prior fascia boards, and that Leafguard had installed "kickers" that lengthened the rafter tails, thus extending the roof line beyond its earlier profile.

The evidence is legally sufficient to support Guidry's position, in that Guidry, himself, testified regarding the thickness of the new fascia boards Leafguard installed, and further testified that Leafguard's work extended the rafter tails. This evidence alone, if believed by the trial court, is legally sufficient to support the trial court's finding. As Leafguard has observed, however, a comparison of the "before" and "after" photographs indicates that both of Guidry's theories of recovery are factually inaccurate, thus extinguishing any possibility that the trial court's judgment is supported by factually sufficient evidence. In particular, we note that the photographs taken before Leafguard's work commenced show a certain amount of shingle overhang, and the photographs taken after McCurtain's work was completed show the same,[3] thereby belying the argument that the outer edge of the newly installed fascia boards was somehow closer to the edge of the shingles than were the

_____

[3] The new windows had beige frames, as required by the terms of the contract. It is therefore a simple matter to identify the old windows as being the ones with the brown frames. Because Guidry stated that Leafguard performed the window replacement work before performing the siding and fascia work, we can identify the old siding, fascia, and shingle overhang by viewing the photographs showing the old windows.

old fascia boards that Leafguard had replaced. The evidence actually shows the opposite fact of what the court found. Therefore, we find the evidence factually insufficient to support this finding.

Even if this evidence were factually sufficient to support a decision that Leafguard's fascia work required remediation, the evidence fails to show the reasonable cost of doing so. Here, as with the windows, the evidence shows only the amount paid for the work. Absent evidence that the amount paid was reasonable, no damages can be awarded based on the evidence in the record. *Id.* We sustain Leafguard's second point. We will remand the case to the trial court for a new trial to determine whether and to what extent remediation is required by the installation of the fascia and soffits and, if found, the reasonable and necessary cost therefor. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).

### 3. The Overhang[4]

McCurtain's testimony arguably constitutes some evidence that Guidry's overhang was "inadequately built." His testimony further supports the proposition that in 2019, $9658 would have been a reasonable cost to repair Guidry's overhang and that this figure would have increased twenty percent by the time of trial. Guidry's testimony *does not*, however, establish that Leafguard built, or contracted

---

[4] In the context of this case, it appears, but is not certain, that Guidry, Guidry's attorney, and McCurtain were using the term "overhang" to refer to plywood roof decking.

16

to build, the overhang on Guidry's house.  Instead, the evidence establishes the opposite fact. Photos produced by Guidry show deteriorated, old decking which no longer reached the edge of the roofline. The contract did not provide for Leafguard to replace any roof decking. This defect would have been hidden from Leafguard when installing the fascia, and there is evidence this defect was within the purview of the roofing company that replaced all, or part of, the roof after Hurricane Harvey—depending upon which version of Mr. Guidry's testimony is accepted. Given the lack of evidence that Leafguard was in any way responsible for the allegedly substandard construction of the overhang, Leafguard cannot be held liable for the cost of modifying it to meet an acceptable standard. For this reason, the trial court erred in awarding Guidry the estimated cost of repairing the overhang.

**4. The Roof**

The record contains unsupported accusations by Guidry that Leafguard damaged Guidry's roof "by lifting the shingles" in some places when applying the fascia and soffit boards. This evidence is factually insufficient to support the trial court's judgment.

The trial court awarded Guidry the entire cost of replacing his roof as that figure was established by McCurtain's testimony. The record, however, lacks factually sufficient evidence to show that Leafguard damaged the roof or that Guidry needed a new roof. Quite the contrary, Guidry's testimony indicates that he wanted

a whole new roof at least partially so that there would be no areas of nonmatching shingles. McCurtain's testimony regarding the possible need for a new roof is conclusory, at best, in that it omits an explanation of how Leafguard actually caused the damage to the roof and why the entire roof, or any part of it, ostensibly needed replacement. This testimony therefore constitutes no evidence of probative force upon which the trial court could have found that Guidry's roof needed to be replaced, and it consequently was error to award Guidry this element of damages.

Although Guidry's testimony also suggests that he wanted, or needed, a new roof so that his roof would qualify for a windstorm inspection certificate, the evidence in the record is factually insufficient to establish that Leafguard caused the alleged damage to Guidry's roof. Instead, it is equally likely that the roof issues were attributable to residual, unrepaired hurricane damage. Guidry's argument that his roof did not used to leak is not evidence of Leafguard's supposed malfeasance, but instead relies on the fallacy of *post hoc ergo propter hoc*. Because mere chronology will not support a finding of causation, we must reverse the trial court's implicit finding that Leafguard damaged Guidry's roof to the extent that Guidry needed a new roof. *See Wortham Bros., Inc. v. Haffner*, 347 S.W.3d 356, 361 (Tex. App.—Eastland, 2011, no. pet.) (Generally, expert testimony is required to establish the necessity and reasonableness of subsequent roof replacements); *see also Cain v. Bain,* 709 S.W.2d at 176 (the court of appeals must consider and weigh all the

18

evidence, and should set aside the verdict only it if is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust) (citations omitted).

We sustain Leafguard's second and third points of error and remand these issues to the trial court for a new trial.

## C. Attorneys' Fees

Having sustained Leafguard's issues two through four, we will not address the issues of damages and attorney fees and remand those issues to the trial court for determination at a new trial.

Accordingly, we reverse the decision of the trial court, and conclude that under the rationale of *Long Trusts*, Guidry is obligated to pay Leafguard at least some amount of the contract price of $34,613,[5] plus interest and attorney's fees as contractually provided. *See Long Trusts*, 222 S.W.3d at 415-16; *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 488-89 (Tex. 2019) (noting that parties may contractually provide for a reasonable attorney's fee). This sum should be offset by Guidry's reasonable and necessary repair costs, if such costs are raised by Guidry's pleadings and properly substantiated by the evidence. *See McGinty,* 372 S.W.3d at 627 (describing the measure of damages).

---

[5] This figure represents the siding cost of $14,900, the window cost of $17,213, and an agreed change order for $2500.

## IV. Conclusion

The judgment of the trial court is not factually supported by the evidence. Leafguard conclusively established that Guidry failed to pay the contract price for the work it performed; and Guidry's evidence in support of his counterclaims lacks sufficient factual support to sustain the judgment in this case. Having sustained issues two through four, we decline to reach issues one, five and six as ruling on those issues would not afford the Appellant any greater relief. Tex. R. App. P. 47.1. This case is reversed and remanded for a new trial to establish the contractual liability of Guidry to Leafguard and to determine any reduction of the contract price to which Guidry may be entitled, including either party's reasonable and necessary attorney fees, consistent with this opinion.

REVERSED AND REMANDED.

_____
JAY WRIGHT
Justice

Submitted on June 2, 2022
Opinion Delivered May 11, 2023

Before Horton, Johnson and Wright, JJ.

20